We will hear argument first this morning in case 2443, United States v. Tsarnaev. Mr. Fagan. Thank you, Mr. Chief Justice, and may it please the Court. After watching video of respondent, by himself, personally placing a shrapnel bomb behind a group of children at the Boston Marathon, the jury in this case returned a nuanced verdict, unanimously recommending capital punishment for that specific deliberate act. The Court of Appeals should have let that verdict stand. Instead, it unearthed a previously unmentioned supervisory rule to invalidate a careful and lengthy jury selection process that a prior panel had praised. That process reasonably favored individualized four-deer over focusing every prospective juror on pretrial publicity through rote content questioning that would have been unhelpful. The Court of Appeals then again usurped the district court's discretion by insisting that the jury had to hear unreliable hearsay accusations against respondent's brother by a dead man with a powerful motive to lie. We'll never know how or why three drug dealers were killed in Waltham in 2011, and none of respondent's evolving theories justifies inserting that separate crime into the penalty phase proceedings for respondent's own individual participation in the 2013 Marathon bombing. And even if the Court of Appeals had identified a misstep in one of the hundreds of judgment calls that this complex trial required, any error here was harmless. The experienced district judge impaneled an impartial jury which heard overwhelming evidence about respondent's own actions and motivations and rendered a sound judgment against a motivated terrorist who willingly named and murdered innocents, including an eight-year-old boy, in furtherance of jihad. Mr. Fagan, one question before you get too deep into your argument. What tests should we use? The First Circuit said that it was exercising its supervisory authority. What tests should we use to review that exercise of authority or to limit that authority? Well, I think there are two separate questions there, Justice Thomas. One is that the Court would need to consider, and deciding either one of them in our favor or deciding that the application of the rule was harmless error would result in a judgment in the government's favor here. But the first question reviewing the supervisory rule is whether the Court of Appeals had the power to enact the rule at all, and the second is whether this Court exercising its own supervisory power would find that rule reasonable. As to the first question, I think the fundamental problem with this rule is that it divests district courts of discretion that this Court has repeatedly insisted that they have over jury selection. If you look at, for example, page 424 of the Court's decision in Moomin v. Virginia, the Court emphasizes that not only in constitutional review but also in exercising supervisory power over the federal courts, it has given district courts wide discretion over jury selection because they're there and they can see the jurors as they're individually questioned and are also familiar with local conditions. As to the second inquiry, I think the main point here would be that although such questions can be helpful in some cases, they're not invariably helpful and the district court had sound reasons for thinking that they would be unhelpful here. I'd also note that on the third point I made, Justice Thomas, that the Court of Appeals in devising this rule clearly has a prejudice inquiry built into it. That's clear from page 60A of the petition appendix. That's consistent with the one supervisory rule that this Court has made in this context adopted by a plurality of the Court in Rosales-Lopez. It's why the Court of Appeals left the guilt verdict in place here, and I think the same analysis ought to apply to the penalty phase verdict. You had a two-year gap between the events and the trial. Most of the publicity, as the Court of Appeals acknowledged, was factual. Most of it related to guilt, which Respondent, in fact, conceded. The jury was repeatedly admonished to disregard pretrial publicity. There were questions on the 100-page questionnaire that went to any potential bias from pretrial publicity, as well as the sources and the amount of pretrial publicity that each prospective juror had seen. There was follow-up questioning in the individualized four-year about that particular question, question 77, with virtually every prospective juror and all the seated jurors. None of the seated jurors expressed a predisposition to impose a capital sentence, which is the only thing at issue. I don't think all that makes sense, but I'm looking more for the standard that you would apply. What would be your rule, assuming you accept, to some extent, the supervisory authority of the First Circuit? What would be your rule for reviewing the exercise of that authority? Your Honor, I think if the Court accepts that the Court of Appeals can dictate to district courts how to do this, I think this Court ought to just be reviewing the rule to see whether that was a sound and reasonable exercise of the rule, bearing in mind that it is an exercise of supervisory power that the Court of Appeals is imposing in a context where district courts have the utmost discretion. Do you think, would we review it as the that authority is exercised, say, on local procedures or something like that? Or are you saying that we should review it in this area for something like reasonableness? Well, Your Honor, I think you could do, frankly, either. I think at the threshold, the Court ought to ask whether the Court of Appeals exceeded its authority in even enacting such a rule. If you look at the Court's decision in Painter, it is a clear expression by this Court that Courts of Appeals shouldn't invoke their supervisory power as an end-around to the reasoning of this Court, which is, I think, what the Court of Appeals has done here. The second way you could look at it, Justice Thomas, is more of a whether, assuming it actually had the authority to do this, should it have done so. And I think if you look at this Court's other supervisory rule decisions, where even accepting the Court of Appeals might have had the authority to enact some rules in this area, enacting a hard-and-fast rule like this that would at least be rigid enough to divest the experienced district judge in this case of his sound discretion to determine that these questions wouldn't be a helpful addition to the mix of information already available to the parties, and that it could be addressed through individualized voir dire, and that the questions might even be counterproductive by focusing the prospective jurors on something that the judge was at the same time instructing them that they should disregard. To the extent the rule is that wooden and that rigid, it is an unreasonable supervisory rule, Justice Thomas. Back to the beginning of your answer to Justice Thomas, do you dispute the authority of the Courts of Appeals to issue some requirements under their supervisory power? Certainly not as a general matter, Your Honor. I think it's a little bit more circumscribed when it comes to jury selection procedures because of this Court's repeated emphasis on the discretion that district courts necessarily have to have. Where does that authority come from? Your Honor, we're following this Court's cases which appear to presume that this Court has some supervisory power and haven't... Well, our supervisory power would be different than the Court of Appeals' supervisory power over district courts, right? Are you just, because we've assumed in some cases that Courts of Appeals have it, relying on our precedent? Yeah, Your Honor, we haven't questioned whether Courts of Appeals generally have supervisory power. I suppose one other way to decide this case in the government's favor would be to take issue with that, but we haven't questioned that specifically. Mr. Fragon, if we took question with that, it would upend a whole bunch of rules, some of which in Moonbeam itself we endorse, but there are local rules about making sure that a pro se prisoner knows that he or she, what rights they're giving up if they're going to proceed pro se. There are local rules on what you have to do if you're going to dismiss a complaint, letting pro se litigants have an opportunity to cure their deficiency. We have local rules on waivers of all kinds, including jury waivers. There's a whole lot of local rules that talk about what courts are thinking about as adequate process, and they're not changing outcomes. They're just saying to courts, before you exercise your discretion, make sure that these things have happened. So are you suggesting that we should take aim at those local rules? No, Your Honor. Let me just emphasize two quick points. As I emphasized to Justice Barrett, we haven't questioned the Court of Appeals' supervisory authority in this case. So why in Moonbeam, I think it said, did we spend, I think, two or three paragraphs talking about local rules? Well, Your Honor, the other point I was going to make in response to your original question before I get to that specifically is we're also not questioning. I didn't take Justice Barrett's question to get at the separate issue of, for example, local rules that district courts enact for themselves. However, in Moomin, the Court did note the existence of some supervisory rules in this context. There might be a question as to how far each of those rules at the time of Moomin would have extended and whether they would have covered this case. But I think the reasoning of Moomin, again, I'd point the Court back to page 424 of that decision, makes clear that in exercising its own supervisory power, this Court has not dictated specific forms of questioning, even in the most sensitive context of race with the supervisory rule adopted by the plurality in the Court of Appeals here to have a rigid, wooden rule that dictates specific questions. It wasn't all that rigid. The rule was very simply stated in Patriarch, which was, ask some questions about the kind and degree of publicity that's out there. And the Court permitted degree. It permitted people to tell how much they had read, a little, a lot, or a moderate amount. But it didn't permit questioning as to what kind of publicity. Because there was a whole lot of different publicity here. There was publicity on the day of the event. There was publicity the days after. There was publicity about what major politicians and others were suggesting the punishment should be. There were kinds of publicity. And the District Court and the government objected when counsel attempted to elicit that kind of information. That seems like an extreme control over trying to figure out whether someone could have been influenced by that publicity. Well, a few points, Justice Sotomayor. First of all, the government did not always object. And if you look at pages 733 to 735 of the Court of Appeals Appendix in this case, you'll see the District Court emphasizing that these questions would be allowable on a juror-specific basis, depending on the kinds of answers the juror had previously given. As to the different kinds of publicity, Justice Sotomayor, they didn't request any questions asking whether jurors had seen specific types of publicity. And I think the reason they didn't do that is because they didn't want to focus the jurors on those kinds of things, like what opinions people might have expressed about the death penalty. So what was wrong with the one question they wanted to ask? What stands out in your mind about all that publicity? It seems to me that that's not asking for details of everything you've read, but what has influenced you or affected you enough for you to remember it. That seems like a totally appropriate question to me. I think as Respondent's own counsel pointed out, and this is at page 480 of the Joint Appendix, a question like that is unlikely to be particularly useful in a case like this, because everyone saw the same coverage, so they were all going to say the same things. The carnage at the finish line, the chase in Watertown, the killing of Officer Collier, the boat manifesto that Respondent wrote. Well, doesn't it tell you something, someone who says something else? How about if you ask a juror that and the juror says, I listened to victim X, and that has haunted me. That certainly would be information relevant to a defense attorney, and even to the prosecution. Well, Your Honor, I think I'd push back a little bit on whether there were, on the idea that there wasn't questioning that got at the kinds of publicity that the jurors had seen. Many of the jurors volunteered such information. There were occasions when Respondent's counsel was able to ask that question, or there was some other revelation of some media coverage that some particular juror had seen. The jurors were extensively questioned on their views on the death penalty in particular, and if the jurors were biased on that by something, that might have itself come out in the course of that question. Counsel, we call this, it's been called the supervisory rule. I'm going to argue a case in a circuit court of appeal. You look at the rules, there's usually a little pamphlet telling you these are the circuit rules. They may be supplemental to the court of appeals rules. What makes this a rule? It seems to me that it's really nothing more or less than a precedent. I mean, is there a collection of these supervisory rules somewhere? This is rule 22? Well, Your Honor, I don't think I'm going to really dispute what you just said. I think everyone was actually taken by surprise that there even was such a thing as the patriarchal rule, given that no one had cited in the district court, including the court of appeals itself, when it was reviewing jury selection procedures in a mandamus petition about venue. It praised the jury selection procedures and never once mentioned it. Should we consider this requirement in any way different from the way we consider any precedent because it's labeled the supervisory rule? If anything, Your Honor, I would give it less weight because it was dictum in patriarchy itself, which simply affirmed the denial of a venue change. So I really do. If we issue an opinion and we write it and it has a particular holding, I think the author would probably be very happy to say, you know, our rule going forward is this. But that's just saying it's a precedent. I don't know attaching a label to it. I mean, Justice Sotomayor is right. There are circuit rules governing a lot of things. And from minor, you know, filed your application on eight and a half by eleven paper to more significant things. But this is a rule of law. I don't see what's gained by calling it a rule. A supervisory rule. I agree with that, Your Honor. I think the reason for labeling it such and the reason certain things are labeled supervisory rules is their advisories going forward to district, in this instance, district courts to tell them that if they do not do something in the future, they will be reversed. We tell them that, too, that if they don't follow this particular rule of law in the future, they'll be reversed. I don't know that every one of our cases governing district court practice is a supervisory rule. Yeah, I think it is particularly geared toward areas like case management where they're just trying to put district courts on notice. I think that is a actually a fairly poor characterization of patriarchy itself, which, as I said, kind of renders this as something of an advisory note at the end of deciding something else. So I'm not even sure. Isn't the distinction that it's not based on the Constitution and it's not based on a statute or a regulation? It is a prophylactic rule that is adopted by the court for the purpose of there is no — that proposition is not that this is required by the Constitution. Is that the distinction? Well, it's not. I think that is one distinction. It's not required by the Constitution. The Court's drawn that distinction in this particular line of cases where it's been somewhat stricter in reviewing federal courts than it has been in reviewing state courts. That's quite clear from, for example, Moomin. And if one accepts that courts of appeals can impose their own supervisory rules in this context, I think what they're labeling a supervisory rule is just, as I was talking to Chief Justice, just an advisement to district courts that this is how you should do it. But I think it definitely exceeds a court of appeals authority to impose such a rule that contradicts the way that this court has handled similar situations. Mr. Fagan, can I turn to the evidentiary question in this case? I've been having a little bit of a difficult time teasing apart your various arguments about why it is that the district court acted within its discretion in refusing to admit the evidence about Tamalin's participation in the Waltham murders. I just thought I'd give you a little bit of a hypothetical, or maybe it's not a hypothetical. Maybe it's just asking you to assume something that you can test, which is, assume for me that the evidence was very strong that Tamalin participated in and indeed had a leading role in the Waltham murders. All right? So assume that the evidence is strong with respect to that. In that case, would the court have committed reversible error by refusing to admit that evidence? Your Honor, I think that would be a much more difficult case for us. Yes. I'm just asking, in that difficult case, would the court have committed reversible error? Well, Your Honor, assuming, and one point I want to emphasize is that in district court here, they did not assert, this is pages 668 and 669. Mr. Fagan, could you just stand for the question? One point I'm trying to make is it would depend whether there was some assertion that respondent was aware of it, which is an assertion they did not make in district court. I'm sorry, I thought they did, but it was earlier in the case. Let's just assume, yes, I'm saying the defendant was aware of it. Now answer the question. If the defendant was aware of it and there was strong evidence of it, I think the district court should have let it in. Neither of those was true here. I assume that you say that because the evidence, assuming it was strong, the evidence clearly goes to a mitigating factor. The entire point of the defendant's mitigation case was that he was dominated by, unduly influenced by his older brother, and that would have gone to exactly that point. Is that right? Your Honor, if you had the knowledge combined with the strong evidence, I think that might well have done it, particularly if it could have been done in a streamlined fashion. But if you look at pages 668 to 669. If that's true, Mr. Fagan, then your entire case rests on the notion that this evidence just wasn't strong enough, that it was too, I don't know what else to call it. It didn't establish that Tamerlan had played a leading role in the Waltham murders. That's what your case is. But how is that the job of a district court to evaluate, much less decide, that question? I would have thought that once the district court says this is obviously related to his sentencing defense, in other words, it goes to his own culpability, it essentially confirms, if it were true, the mitigating factor that he was unduly influenced by his brother. At that point, it's the job of the jury, isn't it? To decide on the reliability of the evidence, to decide whether it's strong evidence or weak evidence that Tamerlan, in fact, played a leading role in those other gruesome murders. Your Honor, just a very quick threshold point. Again, there is the knowledge issue here, and if you look at pages 668 to 669, you'll see they didn't... I'm assuming the knowledge issue. ...assuming knowledge, then I think... I mean, I don't even know that knowledge is all that important, because even if he didn't know, the fact that his brother was the kind of person who played this leading role in these gruesome the role he might have played in this murder, irrespective of knowledge, but at any rate, let's just assume that he had knowledge. Let me just say a couple things directly responsive to your question. One is, everyone agrees that reliability is an important consideration here. If you look at pages 16 to 17 of their brief, page 30 of their brief, they agree with that. Then you have to balance that against the probative value of this evidence. I don't think the evidence really would have added much to the mix of information we already had about, for example, who planned the Boston Marathon bombing. I mean, think about what you're just saying, Mr. Fagan. This court let in evidence about Tamerlane poking somebody in the chest. This court let in evidence about Tamerlane shouting at people. This court let in evidence about Tamerlane assaulting a fellow student, all because that showed what kind of person Tamerlane was and what kind of influence he might have had over his brother. And yet this court kept out evidence that Tamerlane led a crime that resulted in three murders. May I respond, Mr. Chief Justice? Certainly. Your Honor, I think the one thing to bear in mind is these crimes are extremely different. The Waltham crime, everyone agrees, did not involve respondents. It was very differently motivated. It was, even if you accept everything Tadashi said, it was a financial crime where the murder was committed by knife in order to cover up who had committed the robbery of three drug dealers. That is a far cry from a sophisticated public spectacle that required reading directions in a jihadist magazine on how to build and construct bombs and deliberately placing them at the finish line of the Boston Marathon. I mean, it's different that Tamerlane yelled in a mosque, and it's different that Tamerlane assaulted a fellow student, and it's different that Tamerlane yelled at people. But all of this was admitted to show what kind of person Tamerlane was and what kind of influence he had over his evidence of a gruesome, murderous crime in which, according to the evidence that was kept out, Tamerlane had extraordinary influence over a co-felon in getting him to murder three people. Your Honor, Tadashi denied murdering. He says he was out by the CRV when all of this happened, and this is very unreliable evidence because Tadashi had every incentive to pin this entire thing on Tamerlane, who at that point was already dead, and they knew they were looking for him. I'd encourage the court to read the transcript of the interview. According to Tadashi, and I think this is page 947 of the Joint Appendix, Tamerlane says to him, okay, if you will not kill them, I will do it. Isn't that exactly the kind of thing that the prosecutor would have said to the jury about why they shouldn't believe that evidence? But isn't this a classic case in which the evidence understood one way is highly relevant to a mitigation defense, and the evidence understood in the way you just suggested, you know, just says that's crazy, it didn't happen that way. But that's what a jury is supposed to do, isn't it? Your Honor, unlike the other evidence that you have cited, there was going to be no cross Tadashi, who admitted to some participation, and possibly Tamerlane, and both of them were dead. This investigation had hit the end of the road. There was no way to figure out what happened. The district court reasonably determined that. We're here on abuse of discretion review. Moreover, I think everyone agrees that this is subject to harmless error analysis, and if you look at all the other details that the jury heard, and I'm happy to list them all. Mr. Fagan, along the same lines, you say on page 39 of your brief that, under the Federal Death Penalty Act, the countervailing interests that would justify excluding evidence, you can do that if they outweigh the information's probative value. And you note that, on the other hand, under the federal rule of evidence, if the countervailing interests substantially outweigh, do you really think that's a difference in practice? I thought that we err the other way, that under the Federal Death Penalty Act, we want the countervailing evidence that would affect the sentence to come in more easily than we would with respect to general rules of evidence. If I could, two points in response to that, first, I actually think it does make a difference, because Rule 403, which has the word substantially in it, exists as a backstop to bolster other rules of evidence that already ensure reliability, like the hearsay rule and the best evidence rule, whereas Section 3593C substantially lowers the bar for the admission of evidence in the penalty phase of the capital trial, but nevertheless leaves the district court with some tools to ensure fundamental reliability and ensuring that the evidence is going to be appropriate for the case. And the second point I would make is just what negative effect I think introducing the evidence here would have had. It would have sidetracked the proceedings and consumed a disproportionate of it, focusing on Tamerlan, not Respondent, and everyone agrees, and again, this is at page 668 of the Joint Appendix, which is their response to the government's motion in Lemonnier to seek to exclude this, that this isn't just a comparison game where the jury is invited to decide whether Tamerlan or Respondent is a worse person and decide that capital punishment is only appropriate for that person. Thank you. Thank you, counsel. Justice Thomas, anything further? Justice Breyer? I consider everything Justice Kagan asked. A question. This was their defense. They had no other defense. They agreed he was guilty. Their only claim was, don't give me the death penalty because it's my brother who is the moving force. And isn't there one, I think? She's pointed out a certain difference between evidence that was introduced about the brother, i.e., he shouted at the barber, or the butcher, I think it was the butcher, etc., and this evidence, which happens to be an affidavit, which says he murdered three people, including one of his closest friends, by slitting their throats. Okay. Now, it seems to me there's a difference. Does the government think there's a difference? Well, the government took Fidasha's affidavit and used it to show probable cause to search a car. Now, if the government thinks it stands up enough to show probable cause at least, isn't it enough to get into a death case? When was the last time there was an execution in Massachusetts? I mean, and as far as knowing about it, the lawyer, what's his name, Kadhir Bhavi, all right, that's a complicated name, but it's a simple point. There was evidence in this trial, though introduced before, where he said that, that is, he was the friend, and the lawyer said, Kadhir Bhavi, the friend, says that he did know about it. Nobody denied that he knew about it. All right. So those, I think, were the points that Justice Kagan was trying to make. And unless there's a much tougher rule of mitigating evidence in a death case, then there is to show probable cause to search a car. Why doesn't this come in? Well, Your Honor, there were a couple of questions packed in there. Let me respond to the warrant affidavit question and also the Kadhir Bhavi proper question. On the warrant affidavit question, if you look at page 996 of the joint appendix, which is the warrant affidavit, the agent doesn't endorse any of the details of Fidasha's story. He says that he believes there's probable cause to believe that Tamerlan and Fidasha planned and committed the Waltham crime, but without saying that Tamerlan necessarily played a lead role. And this Court made clear in Franks that simply quoting a third-party statement doesn't necessarily endorse them in the context of an affidavit. And moreover, as a more general matter, a warrant affidavit is a very different inquiry into a very different thing. The Court has emphasized, for example, in Illinois against Gates that there's a qualitative difference between probable cause and proof by preponderance, even by preponderance of the evidence. And we're just looking at reliability in that context for reliability to investigate further, not reliability to prove anything at trial. On the Kadhir Bhavi proper, I think there's a very important difference between Kadhir Bhavi proper and the Kadhir Bhavi trial, which is coming in at the appellate stage. Because at trial, I think the reason they didn't focus on the Kadhir Bhavi proper, which they mentioned in the course of their discovery motions, but not as a reason to admit this evidence, not as a basis for opposing the government's motion in Lemonnet, is because they never wanted Kadhir Bhavi on the stand, probably, because to the extent anything in the bullet points down on JA 584, you will see that Kadhir Bhavi also offered to testify that one month before the bombing, he had a conversation with a respondent, which respondent admitted that he'd learned how to make bombs and was speaking glowingly of martyrdom. Justice Alito, anything further? Justice Sotomayor? I do. Counsel, this is a constitutional right to present mitigating evidence. It seems to me that I'm not sure how we would ever have an abusive discretion review on a district court's decision not to permit a defendant to put on a defense. It has to be something else, because I don't know of any other situation where you can deny a defendant the constitutional right on a simple weighing. But putting that aside, I'm also unsure what the reliability of this information is about when, although you're saying that they wouldn't have put in the evidence that the defendant knew about this killing, there were multiple people who they proffer to us now who could have testified to the fact that this defendant knew his brother had committed these killings as jihad, which would have meant the truthfulness of the confidential informant was irrelevant, because it doesn't really matter who took the lead in the killing or even if the brother participated in the killing. The only issue would have been, what did the defendant think? And so I'm not sure whether the relevancy issue that the district court ruled on made any sense to me, but please explain to me how we, what should be the standard of review assuming a constitutional right to present mitigating evidence and assuming, as Justice Kagan showed, this evidence was relevant to how this young brother might have reacted to the entreaties of an older brother who had already committed jihad? Well, Your Honor, the Court of Appeals expressly found that this Abusive Discretion Review was the appropriate standard of review, and Respondent hasn't taken issue with that in this court. And as to the point about knowledge, if you look at page 976 of the Joint Appendix, you will see that the government's motion in limine said that Respondent had not asserted that he knew about the Waltham crime, and we acknowledged it would be a different story if he had. In response, on page 669 of the Joint Appendix, the court says, I'm not letting this evidence in because we fundamentally cannot tell what happened. The district court did not understand this to be a question of Respondent's knowledge, and I think that's one reason to review this with some deference to the district court's case. To force all the victims to come back and testify and have to reassess the same sentence is, I think, less reasonable. Mr. Blankenship, part of the problem is that the district court withheld information, and so the defense attorney could not proffer everything at once because it didn't have full knowledge of what was there. Now that they do, they can show us A, how pertinent that information was, and B, how it could have dovetailed easily with what they already had. You can't put the cart before the horse here, and the cart before the horse was the denial of discovery. Well, first of all, Your Honor, I don't think that Respondent is alleging that the government didn't disclose something related to Respondent's own knowledge. Second, to the extent that they want to pursue further discovery, I think it just emphasizes how this is really going to sidetrack the proceedings into investigation of a different crime. And third, that crime is not particularly related to the Boston bombing in which Respondent personally participated, and there was substantial evidence about the roles of the brothers in that crime. Some of that evidence was disputed, but I think what is quite clear and what we put into the record is that there was evidence that Respondent told a friend he was planning something with Cameron. There was evidence that Respondent had sent messages and tweets touting jihad. There was evidence that he bought the gun from his drug dealer. There was evidence he went to a doing something with Cameron, actually planning something with Cameron. Justice Kagan, anything further? I do. I mean, here are the mitigating factors that the court itself put to the jury. The court was very well aware of, as Justice Breyer said, the only argument that the defendant was making in this case, which was an argument about undue influence, and an argument that although he did it and he was guilty, that he should not get the death penalty because he was unduly influenced by his brother. And so the court put the following to the jury. Here are the mitigating factors. The defendant acted under the influence of his older brother. Whether because of the brother's age, size, aggressiveness, domineering personality, traditional authority as the eldest brother, or other reasons, the defendant was particularly susceptible to his older brother's influence. The defendant's brother planned, led, and directed the bombing. The defendant wouldn't have committed the crimes but for his older brother. Now, all of those, that was the entire case. Were those mitigating factors sufficient to give him life in prison rather than the death penalty? And yet, the court keeps out evidence that the older brother committed three murders in the way that Justice Breyer explained? Well, Your Honor, I think I've already gone through the way this came into the district court, but the other thing I'd emphasize is I don't think their theory on probative value is particularly strong. I think if this jury heard that Respondent was aware or thought that Tamerlan had committed a murderous act of jihad, it would have expected him to be horrified, not to view that as an even more murderous act by planting a bomb. Mr. Fagan, as your brief says multiple times in the voir dire context, this jury actually produced a very nuanced verdict. It said anything, as to any acts that the two brothers were together, there were mitigating factors and death was not the appropriate sentence. It was only the acts where the older brother was not on the scene in which death was appropriate. Now, do you think it's possible, and that's all that has to be shown in such a case, that if all of this evidence about these murders were produced, a jury that was obviously sensitive to the issue of the relationship between the two brothers and how that relationship affected the defendant's actions, do you think it's possible that that jury would have said, even when Tamerlan was off the scene, the older brother, he continued to exert an enormous influence because this is a guy who walks into places and murders three people? Your Honor, there was no evidence that Tamerlan physically intimidated Respondent into doing anything. He was in fact physically separate when he planted his bomb. And as for the influence evidence, as I've just said, I think the jury is much more likely to have found this weighed against Respondent, not as a mitigating factor in his favor. And let's bear in mind that this is a jury who heard evidence about the Bogue Manifesto that Respondent wrote after he ran over Tamerlan in which he justified his actions on the basis of jihad and showed how proud he was of them. And that's after he needn't worry about Tamerlan at all. In fact, he thought he was dying. Justice Alito? There's really an interesting sort of evidentiary question here. And I like your explanation of the standard that applies. This evidence is inadmissible many times over in a regular trial where we have rules of evidence. But at the mitigation phase of the penalty of a capital case, maybe the rule is anything goes. And if that is the case, well, that's what I want to know. Is it really anything goes? So suppose what we had in this case was quintuple hearsay about something that Tamerlan supposedly did years ago in Russia. One person in Russia told another person in Russia who told another person in Russia down the line that he did certain things. And that is admitted. Then what can you do in response? Can you then introduce evidence to show that it actually didn't happen? Or can you introduce evidence to impeach the credibility of some of these hearsay declarants? How is all this to be handled? Well, Your Honor, I think those would be options. I think one way to look at this is if you look at, for example, the court's decision in Green against Georgia, Georgia there maintained its hearsay rules in the penalty phase of a capital trial. And it had imposed the hearsay rule, and this court found that it had violated the defendant's Eighth Amendment right in doing so. But before it was able to reach that conclusion, it assured itself that the evidence was reliable. And I think that is at least a minimum floor that even the Eighth Amendment would require. And at some point, some sort of quadruple hearsay hypothetical that presumably requires some translation from the original Russian might well exceed reliability. And here what you had was evidence that nobody who is still alive would have been able to attest to, unlike the other evidence that was heard in this case. Justice Gorsuch? Mr. Fagan, on the Waltham murders, we have to review the district court's decision, maybe for abuse of discretion, maybe for something else. And he had a way, though, in his mind, on the one hand, the relevance, and on the other hand, the potential for confusion under the statute. And if you could just, putting aside all the hypotheticals, actually give me the government's best argument on why it wasn't relevant on the one hand, and why it would have caused confusion on the other. Certainly, Justice Gorsuch. I think there are, now it has boiled down to a couple of theories of relevance. One, and I'll try and be as succinct as I can. One is that it made it more likely that Tamerlan planned the crime. And as I said earlier, and I'm happy to expand on this, if you want me to. I understand their theory. I just want to know your best arguments on why it wasn't that relevant, and why it would have caused confusion. Those are the two things you'd have to show. I think our theory on why it wasn't relevant necessarily responds to their theories of why it was, which is why I'm identifying that theory. Let's spot them, then, as succinctly as you can. We don't think, even if Tamerlan had participated in a separate crime, that, assuming we had some reliable evidence of that, that it really shows that he is more likely to have planned this different crime. And as for influence, it really doesn't show any physical influence, because of course, Tadashev opted out. And it, I don't think, shows psychological influence, because in order to conclude that, the jury would have to infer that Tamerlan was actually involved, that he did so as an act of jihad, which is not what Tadashev said. The respondent knew about it. The respondent viewed that as, essentially, a plus factor for following Tamerlan, not as a significant detractor, finding out that his brother is a jihadist murderer, and that that would lead him to own deliberate acts, of which there were many separate, physically separate acts, in carrying out the Boston Marathon. As to confusion, I think unreliability of evidence is itself part baked into the confusion inquiry, and I think the jury, this would have consumed a disproportionate amount of the penalty phase proceeding focusing on Tamerlan, and it's supposed to be a proceeding that focuses on the individual culpability and history of this particular defendant. And I think it really would invite precisely the kind of comparison game that everyone agrees would be inappropriate. The jury was supposed to be focused on respondent, not on something Tamerlan might have done two years earlier that was a quite different crime. Thank you. Justice Kavanaugh? Mr. Fagan, at the beginning of this entire line of questioning, you were asked to assume away something, and I'm confused because you were asked to assume away what I think was the district court's reasoning here, because the district court said, and I'm quoting, there was, quote, insufficient evidence to describe what participation Tamerlan may have had in those events, end quote, end quote. It is as plausible that Tadashev was the bad guy and there's just no way of telling who played what role if they played roles, end quote. Now, we reviewed that analysis for abuse of discretion, correct? I agree, Your Honor, and I would just emphasize to the extent we're looking at something different now, and they've suggested in their brief that maybe they wanted to produce a more streamlined version of the evidence where they just introduced knowledge and the fact that Tamerlan was involved in some way, that itself is not what the district court was considering. The district court here was presented with this theory, and the district court said, we don't know what happened. There's been insufficient evidence of who did what, and therefore the theory that Tamerlan was the lead player in that is entirely, well, is unreliable because we don't know, and Tadashev had all the motive in the world to point the finger at the dead guy to say that he was the ringleader of slitting the throats of the three drug dealers, right? That's exactly right, Your Honor, and one other thing I'd emphasize is this wasn't even any sort of final confession from Tadashev. This was basically interrupted midstream when Tadashev, after having talked to the officers, went back into, I believe it was his kitchen, got a pole and tried to attack them, and that's why Tadashev was killed. So I think it's just an inherently unreliable midpoint statement from someone who was at least clearly somewhat unhinged and had every reason to pin this on the person who had committed the his brother, the respondent here. Right, so that's the district court's theory, and then your answer is to the line of question where even assuming that Tamerlan did play the lead role, which we don't have evidence of, the district court concluded, even assuming that, that still gets into the comparison game that you said the district court could conclude that's not the right role, the right analysis for the jury to take in a case like this. That's correct, Your Honor. I just want to make sure the premise, I mean, the premise was assumed away. The premise was assumed away because that's the role of the jury. Well, I think it's important to discuss the district court's reasoning, and the district court said, we don't know what happened. And the district court, I mean, maybe to answer Justice Kagan's question, does the district court have a gatekeeping role here or not? And maybe that's Justice Alito's question, too. Well, just to be clear on, I think, the couple of points you've raised, I don't concede the premise. I agree with the way, Your Honor, Justice Kavanaugh has analyzed it, and I also do believe that I was discussing most in-depth probably with Justice Alito and a little bit with the Chief Justice with respect to the statutory requirements in 3593C. The district court does have a very important gatekeeping role here, and I don't really think that's disputed. It's not really an anything-goes regime, even in the penalty phase of a capital trial. It is a much, much lower evidentiary standard. Everyone agrees in the Eighth Amendment requires, but it's not anything-goes, and the district court exercises discretion here to keep out inherently unreliable evidence that wasn't especially probative and had a substantial risk of confusing the jurors, as I was just explaining to Justice Gorsuch. Justice Barrett, anything further? Mr. Fagan, I'm wondering what the government's endgame is here. So the government has declared a moratorium on executions, but you're here defending his death sentences, and if he wins, presumably that means that he is relegated to living under threat of a death sentence that the government doesn't plan to carry out. So I'm just having trouble following the point. Well, Your Honor, the administration continues to believe the jury imposed a sound verdict and that the Court of Appeals was wrong to upset that verdict. If the verdict were to be reinstated eventually, which will require some further proceedings on remand, there would then be a round of collateral review, some time for reviewing any clemency petitions. Within that time, the Attorney General presumably can review the matters that are currently under review, such as the current execution protocol, and what we are asking here is that the sound judgment of 12 of Respondent's peers that he warrants capital punishment for his personal acts in murdering and maiming scores of innocents, and along with his brother, hundreds of innocents, at the finish line of the Boston Marathon should be respected. Thank you. Ms. Anders? Mr. Chief Justice, and may it please the Court, under the Constitution, a death sentence is lawful only if it reflects a reliable and reasoned moral judgment to the offense and the defendant's culpability. That bedrock principle is violated in two ways here. First, the district court violated the First Circuit's long-standing voir dire supervisory rule by refusing to learn whether jurors had been exposed to inadmissible and inflammatory publicity that could prejudice their consideration of the death penalty. Second, and more fundamentally, the district court violated the Eighth Amendment by categorically excluding evidence that Tamerlan robbed and murdered three people as an act of jihad. That evidence was central to the mitigation case. The defense's entire argument was that Jokar was less culpable because Tamerlan indoctrinated him and then led the bombings. Tamerlan's commission of the murder supplied the key indoctrinating event by demonstrating to Jokar that Tamerlan had irrevocably committed himself to violent jihad. That would have had a profound effect on Jokar, who was already in thrall to his brother and therefore would have felt intense pressure to follow Tamerlan's chosen path and to accept extremist violence as justified. And Tamerlan's prior experience carrying out violent jihad made him more likely to have led the bombings. The evidence's exclusion distorted the penalty phase here by enabling the government to present a deeply misleading account of the key issues of influence and leadership. The government argued that Tamerlan was merely bossy. The Waltham evidence showed that wasn't true. The government argued that Tamerlan did no more than send Jokar a few extremist articles. The Waltham evidence showed that wasn't true. The government argued that the brothers were equal partners because Tamerlan had not succeeded in jihad until Jokar joined him. The Waltham evidence showed that wasn't true either. But the defense couldn't make any of those points. A sentencing proceeding where the defense is not permitted to make its fundamental mitigation argument and to rebut the government's aggravation arguments cannot result in a reliable and constitutional death sentence. Now I'd just like to start where the court left off with my friend Mr. Fagan with the government's acknowledgement that this evidence should have come in if Jokar knew about it and if there was evidence that Tamerlan did it. I think that's exactly right. But the key point here is that the test for relevance is the permissible inferences that the jury can draw from this evidence. And so I think the district court committed legal error here by saying that the evidence lacked any probative value at all and I don't understand the government to defend that position. I think the far stronger inference here from the evidence was that in fact Tamerlan had a significant role in these murders. We know that because not only did Tadashi say that, but there's ample corroborating evidence which we've gone through in our brief that starts with Jokar's own statement to his friend that Tamerlan committed these murders and committed them as an act of jihad. He would not have said that. It's been a minor role. We know that Tamerlan was the one to review just a few weeks before the murders the extremist teachings of Anwar al-Awlaki advocating robbing non-believers as a form of jihad that provided the extremist motivation for this offense. We know that Tamerlan was the one who knew Brendan Mess, the primary victim here. There was no evidence that Tadashi did. And of course Tamerlan's involvement is corroborated by computer search history which shows that either Tamerlan or his wife within a few days of the murders searched for Tamerlan's name in connection with the murders. I think there's ample corroborating evidence here. The far more likely inference, the far more plausible inference for a juror to draw would be that Tamerlan was involved in these crimes that he played a significant role and that Jokar knew about that. We know that. Can a trial judge at the penalty phase of the capital trial ever exclude mitigating evidence that meets the very low standard of relevance on the ground that it is highly unreliable? Yes, I believe the eighth amendment would permit a framework that once evidence is relevant and reliable then the eighth amendment constrains the district court's discretion to exclude it on other grounds. So the judge can make a determination of reliability? Absolutely, and the test for reliability is minimal indicia of reliability. That's what all the lower courts have used in determining whether evidence should come in in capital sentencing. Minimal indicia of reliability. I think whether evidence satisfies that is a mixed question of law and fact. I think it turns on whether the evidence has corroboration or other indicia of reliability and I think here the district court committed legal error by because the corroborating evidence the government has not disputed and these other evidence that we talked about in our brief the government has not disputed the reliability of it. All right, but where the minimum evidence of reliability, minimum standard of reliability is met and what is at issue is another crime, another event different from the one that's on trial. To what degree can the prosecution then respond by introducing evidence that disputes the version of the other event that is proffered by the defense and to what degree can the prosecution respond by impeaching the reliability of the hearsay declarants who provide the mini-trials. If a person is on trial for murder X you don't have a trial about murder Y and murder Z. To what degree can a trial judge at the penalty phase say we're not going to do this because what would happen then is another trial within this trial about what happened at Waltham. I would push back against your honor's point that this sort of evidence of another crime never comes in and I think that will enable me to answer the rest of your question. So, I think it actually unadjudicated crimes evidence is a staple of capital sentencing proceedings. It often comes in in aggravation. The prosecution. I'm talking about a trial where there are rules of evidence. This stuff doesn't come in and my question is to what degree if any do the considerations that keep it out at a trial where there are rules of evidence also apply in a diminished form at the penalty phase or is it the case that if the defense puts in anything that's relevant and it has minimum evidence of reliability then you're off to the races and you have a mini-trial about this other event or is it one-sided the defense gets to put in this minimally reliable evidence but the prosecution cannot respond. Well, two points in response to that I think the first would be if we were looking at this under the rules of evidence so at trial actually there would be no kind of basis for categorical exclusion on reliability grounds. Tadasha's statement would be treated as a statement against interest under the federal rules of evidence 804b and at least those statements in which Tadasha implicated both himself and Tamerlan would come in under this court's decision in Williamson. So, I think even looking at this under the rules of evidence there would be no basis for categorical exclusion. I think that just points up the legal error in the district court's ruling here and I would say with respect to capital sentencing what this court has said over and over again including in Gregg is that more evidence should come in at the capital sentencing phase not less and that's because we think the jury will make a more reliable sentencing determination if the jury gets to see the evidence. Fourth Circuit said this in Runyonside in our brief that the jury not the judge is the primary arbiter of reliability at the sentencing phase. Mr. Wilson, can I ask you a question that follows up on that? So, the federal death penalty act the first sentence says the defendant may present any information relevant to jurisprudence but it goes on to say information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice confusing the issues or misleading the jury. So, I want to know if reliability is the same as that and just because something would be admitted under the federal rules of evidence as a statement against interest or I guess put differently the hearsay rules wouldn't keep it out doesn't mean that the district court wouldn't have discretion under 403 under a very similar standard as this to keep it out. So, I think another way to think about Justice Alito's question is is this part of the federal death penalty act inconsistent with the eighth amendment or do you think that that sentence in the federal death penalty act is a legitimate ground for excluding evidence? I don't think the two are inconsistent and I'll answer that directly but first let me say that I think the way to think about reliability here is that the district court committed legal error by finding that the corroborating evidence here didn't rise to the level of the minimal indicia of reliability the standard that applies and I do think the fact how this would be treated under the hearsay rules actually is quite probative here because of course the hearsay rules are designed to reflect what we think of as more reliable statements that should come in. Regardless of reliability and reliability under the hearsay rules we still have 403 and in fact you know the court was weighing it was weighing you know the risk of prejudice unfair prejudice against its probative value which the district court thought was nil. So, put aside reliability for a minute and I want to know because this seems to be you know the the gravamen of Justice Alito's question and of what the district court did. It was saying this would spin off into a mini trial its probative value was low it would confuse the jury and it wouldn't add much. Are those legitimate grounds for excluding the evidence under the federal death penalty act in the eighth amendment? Well those are obviously the grounds that the federal death penalty act allows district courts to consider but let me just sort of break down how I think that that works here. So, with respect to confusion I think that ordinarily one would review a district court's conclusion that evidence might be confusing deferentially but I don't think that's the case here and the reason for that is that the court first said this it is completely irrelevant so I think the confusion ruling that the district court reached is bound up follows directly from its relevance ruling and so that you can't separate the two and because of that the district court never did any weighing here under the fdpa said the evidence is completely irrelevant that's all really needed to find right there is no weighing of countervailing considerations. I think there are two different theories here though for why it should come in you have and correct me if I'm wrong one emphasized more trial was that Tamerlan had played a lead role in Walton murders and therefore that was relevant to show a lead role here and the district court said as I quoted earlier there was insufficient evidence to show or establish or be probative of that theory at all. A second theory which I think you're emphasizing more here is the mere fact that Tamerlan committed another murder is itself relevant so suppose Tamerlan had committed the Walton murders by himself and it was undisputed would that be something that has to come in in the death penalty trial here or the penalty phase of of his brother? I think it absolutely would be something. And explain the relevance there where the defendant is saying that he committed he the defendant committed these murders and named these people but my co-defendant is a worse person because he previously committed some other murders is that the theory or explain to me the theory because that's not registering completely with me. Sure so that's not the theory the theory is that Tamerlan influenced Jokar Tamerlan indoctrinated Jokar and Jokar radicalized because of Tamerlan and Tamerlan was more likely to have led the bombings. I think Tamerlan's commission of a previous jihadist murder was directly relevant to that theory and that's so for a couple reasons and I think the first is that this was the key indoctrinating event right everything else in the admitted evidence was just talk it's just Tamerlan sent Jokar a few a few articles this was the event by which Tamerlan demonstrated his absolute commitment to violent jihad and we already know that Tamerlan was enthralled to sorry Jokar was enthralled to Tamerlan that he was occupied the subordinate position in the family hierarchy in light of that he would have felt tremendous pressure to accept Tamerlan's violence as justified and I think we know that that was really important here that that the murder was the key indoctrinating event because of the arguments that the government was able to make in the absence of this evidence so as I said the whole dispute here between the defense was how did Jokar radicalize why did he radicalize the admitted evidence as I said was simply that that in terms of actual persuasion the only actual persuasion was that Tamerlan had sent Jokar a few articles I thought the evidence on how he radicalized was that he read inspire Al Qaeda's magazine he read Anwar al-Awlaki's messages and he became influenced by those and all of those articles were given to him by Tamerlan and so what the government was able to argue was you know look Jokar must have radicalized on his own by reading those articles because nothing about the fact that Tamerlan gave him articles would exert any kind of influence so in other words if you're a younger brother under your older brother's sway you won't feel any particular need to to accede to persuasion if the form of persuasion takes is a few emails that say hey here's an article I thought you might be interested in the Waffenmers would have proven that that's not all that was going on between the brothers Tamerlan at the time that that Jokar was attending freshman orientation Tamerlan was committing jihadist murder he demonstrated through that that he was absolutely committed that he was irrevocably committed to the point of murdering his friend right and at that point Jokar would have faced a choice does he follow does he not we already know that he was under Tamerlan's sway and so there would have been tremendous pressure there that's what the jury could have found and with respect to leadership I also think that the murder is incredibly probative here so the admitted evidence shows that Tamerlan was older that he occupied a superior position in the hierarchy but there was nothing in the admitted evidence that showed that Tamerlan had the ability to carry out a jihadist offense that he had done before and that he had he had the experience to do that so the government was able to argue look Tamerlan's never actually succeeded in anything he's ineffectual he's merely bossy and so you know whatever you think about his being older and having influence on his brother that doesn't matter the brothers must have been equal partners because Jokar was not able to go into action that's page 873 of the J.A. he was not able to go into action until Jokar joined him that's just just to follow up on on on this question from Justice Kavanaugh as I understood it your your primary theory below on the relevance of this evidence Waltham was to show that the similar crimes is that right I think we made all of these arguments below I think that's one thing about this evidence it's it supports a variety of inferences so if you look at J.A. that certainly seems to be what the district court understood your argument to be though would you agree I think that I think the district court concluded as we've been talking about that there is no way to tell in its view who did what in the apartment but okay so let's deal with let's let's pursue that then if if the district court's theory was uh if the district court understood your theory to be that this evidence showed the brothers leadership capacities and roles and if if the district court found that based on the evidence before it there's really no way to know who took the leadership role in the Waltham murders um because the the evidence is gone now the witnesses are available um what do we do with that well I think that is error too because if you look at what the defense said to the district court it was a broader theory than that so but let's just deal with that theory let's assume that's the theory that that you know again maybe I'm unfairly asking to put things aside but with respect to that theory what's wrong with the district court's conclusion I think there are several things it's not a basis for categorical exclusion I do think the first point would be that again counsel though I you're fighting the hypothetical and I understand that but I don't like a lot of hypotheticals either sometimes but if the theory was it shows leadership because he's done leadership in the past and if the evidence is impossible to determine who who led the Waltham murders then what well again I think that would still be error because even if that's the theory the district court there was corroborating evidence I think that suggested a leadership role here and both parties pointed out to the district court that you could analogize to the federal rules of evidence you might have a situation in which some things come in but some things don't and so I think that's why the court erred uh in categorically excluding this I think the corroborating evidence that would have suggested a leadership role here again Tamerlan's the one who steeped in jihadist materials Tamerlan's the one who knows Brendan Metz and Tadasha says and and this is something that the government credited in the search warrants uh that that that Tamerlan was the one who came up with this Tamerlan's the one who he's the only one who knew the victims Tamerlan and Tadasha also was in the course of writing his confession to the crime when he attempted to uh overcome the law enforcement officers that's correct and that's something certainly the government could have pointed out but again I think the test for reliability here is is this statement corroborated by other evidence we think there's ample evidence to corroborate it and that's before we even get to the search warrant in which the government itself credited at least some of Tadasha's statements said these are appropriately accepted as true for fourth amendment purposes that is what the government represented in that warrant and so we think that ought to ought to be compelling evidence in thinking about reliability that this is certainly reliable enough to go to the jury because of course the jury again is the ultimate arbiter of reliability in at the penalty phase what is your response precisely to the claim and the government makes it look thanks judge if I let in this Tadasha uh affidavit I there are about seven issues here about whether I'm lying about what uh the defendant actually knew about about about your response to that this trial has already gone on a long time it'll go on for another year now what's your response to that so I have several responses to that the first is that um as we've said in our brief that not all of the Tadasha statements would have had to be admitted don't think that the jury needed to major role here and did so for jihadist purposes so the court would have had discretion to to to limit the presentation of evidence in that respect the second thing I would say is that just because evidence is contested by the government doesn't make it unreliable as we mentioned before unadjudicated crimes evidence comes in all the time and the defendant contested and that is never thought to be a mini trial in any other circumstance and certainly in this case there were other forms of hearsay there were other FBI reports that came in where witnesses described to the FBI their interactions with Tamerlan and nobody thought that the jury was going to get all tied up and it was going to take years to figure out exactly what Tamerlan said whether he said what the witnesses said he said everybody understood that what could happen was that the jury would evaluate those reports in conjunction with an instruction from the judge about how to evaluate them the fact that they're hearsay and then any corroborating evidence that's what juries do and then the final thing I would say is that although the government has has said that there would be a you know extensive mini trial here it has never really said what that evidence would be I mean as far as we can tell this would more naturally be attorney argument this this would be just as it actually happened at trial the government would get up in its opening closings and tell the jury what it thought the jury should take uh from this information that would not be a mini trial that that's just a little bit more in an opening or closing Ms. Anderson in your brief I thought that you were arguing that there is no real balancing test under this rule um under 3593 with respect to mitigation that it has to be as I think some of your amici argue that the balancing has to be with respect to aggravating evidence that there is a different standard of applicable to mitigating evidence it sort of doesn't make any sense to have a pure 50 50 balancing test with respect to mitigation because it's a constitutional right I think certainly in the case of mitigating evidence the eighth amendment does come into play and and imposes an independent constraint on the district court's discretion the way I think that works is that once evidence is relevant and reliable and the eighth amendment creates a strong presumption that the evidence should be admitted in some form and and so I think it would take some extraordinary concern on the other side to justify categorically excluding evidence especially when there are case presentation ways there are narrower ways for a district court to address whatever case presentation concerns it has I think in this case none of the countervailing concerns the government has come close to satisfying that high standard to justify categorical exclusion just been talking about confusion I think again the government's confusion arguments I don't think provide on their own terms a basis for categorical exclusion here and the government would not have to do anything more I think than than make these arguments um and we've also talked about reliability I think again the the statements here were amply corroborated by analogy to the federal rules I think there was ample reason that they should come in before we even talk about the search warrant and I just want to just want to make clear something here about the extent to which this exclusion distorted the entire penalty proceeding and I think the way that this unfolded is particularly important the government moved in limine before the penalty phase began to have this information categorically excluded that freed the government to tell the jury in its opening and then again in its closing that influence was the quote-unquote centerpiece of the defense's case and that the government and that the defense had presented no evidence that's another quote from 816 of influence then throughout the penalty phase and in its rebuttal the government was able to argue that Tamerlan is merely bossy that he merely sent Jokar a few articles that's all that's all the influence that happened that Tamerlan couldn't go into action until Jokar joined him the Waltham evidence would have changed the terms of the debate the government could not have made those arguments if it had the defense would have said Tamerlan is not just bossy he's violent he's already committed violent jihad Jokar knows about it there's no question that that would have a profound well it would change the term assuming it would change the terms of the debate it would focus debate on something that the district court determined really just couldn't be resolved there were no witnesses uh available they were both dead um and he concluded that that require uh i don't know if you use the term or not but a mini trial it's certainly a a detour into something that at the end of the day there was no basis for resolving it isn't a question of you know who do you believe it's a they're both dead uh and and uh they're not there and and you the determination is whether that uh whether that was an abuse of discretion well i think the district court committed legal error in making that conclusion because again it's a question of minimal indicia of reliability and so the jury would have evaluated this evidence the way it would evaluate any hearsay evidence it would put the statement next to the corroborating evidence and it would decide what it thought and i think here we're not just talking about sadash's statement i think that's critical we're talking about corroborating documentary evidence jokar's own statement that tamerlan did this the jury could have evaluated all of that i don't think it would have taken a mini trial because again we're talking about a fairly limited uh for a fairly limited universe of evidence here that could have been presented quickly again this goes to a central aspect of the penalty phase this was the mitigation case so i don't think this could be an improper mini trial here it's the trial right this is the issue as to whether jokar is going to get the death sentence or not it's whether it's whether he was indoctrinated at tamerlan's instigation and whether tamerlan was more likely to leave that's only argument that the defense has and so i think the idea that it would be an improper mini trial to put on some hearsay evidence when many other pieces of hearsay evidence came in throughout this penalty phase on both sides and have the jury evaluate that in the context of corroborating evidence i just don't think that can be a mini trial just to be clear what is your argument about the standard under the federal death penalty statute do you argue that the the balancing applies only to the aggravating evidence and not the mitigating evidence if it applies to the mitigating evidence do you argue that it's inconsistent with the eighth amendment no i think i think the way that this works is that the fdpa sets this very broad standard and what the courts of appeals have recognized is that you know constitutional prohibitions on admitting aggravating evidence and then of course the eighth amendment concerns about admitting evidence those also operate on the eighth amendment which would would control in the case of mitigating evidence the court has discretion but once evidence is relevant and reliable that discretion is limited uh the eighth amendment creates a strong presumption that the evidence should come in in some form i think that principle comes from both skipper versus south carolina and green versus well i'm not sure i really understand your answer the statute says that the evidence may be excluded if the probative value is outweighed by the danger of creating unfair prejudice confusing issues are misleading the jury uh is that the standard for the exclusion of mitigating evidence i think the eighth amendment will control when when the mitigating evidence is relevant and reliable and it will limit the discretion further i think that the courts of appeals have said the exact same thing in the context of the fifth i still i don't understand either that's the test where the eighth amendment supersedes it to some degree i gather it's the latter you think the eighth amendment supersedes this to some degree this is to some degree unconstitutional i think the eighth amendment yes provides a superseding limit on discretion just the way that other amendments provide a superseding limit on discretion when we're talking about admitting aggravating evidence that's what the second circuit said itself it's what many of the other courts of appeals have concluded that that when there is a constitutional concern the court of course just to get a straight answer justice latest question so you are saying that that last phrase when we're talking about mitigating evidence is inapplicable um or inconsistent with the eighth amendment because once evidence passed the threshold of reliable and probative the court can't consider prejudice confusion of the issues etc as a reason for excluding it no to be very clear it can consider those issues i just think that the eighth amendment creates a strong presumption that those issues would have to be extraordinarily weighty before they could justify substantially outweigh like 403 does it just says outweigh right but i think the eighth amendment uh imposes a constraint here and again this comes from skipper versus south carolina that where the evidence is relevant and reliable countervailing concerns would have to be extraordinary they would have to be extremely weighty so the answer then to justice latest question would be that it's unconstitutional when applied to mitigating evidence at least to some degree under the eighth amendment i think you could think about it that way but i don't think that's how the people have thought about it that way but that's your position right because the last sentence just says outweighs and it tells the district court unless it's only applicable as justice sotomayor suggested to aggravating evidence right i think the eighth amendment the discretion under the eighth amendment is in some circumstances more limited than the discretion under the fdpa yes and the courts have said the same thing with respect to aggravating evidence did you want did you make this argument below that the the federal death penalty act is unconstitutional it strikes me as kind of a new thing here today um no again i don't think i just we have to establish that the that the that the fdpa is unconstitutional because the eighth amendment just provides another constraint on discretion that's what we said below that this was both an fdpa claim and it was an eighth amendment claim i think another way to think about this actually is that you know what did this in some ways you don't have to you don't have to get to it here because what the district court actually said here was this evidence is completely irrelevant and therefore confusing so the district court never got to any weighing under the fdpa so we're in a situation in which there really isn't any discretionary determination to review under the fdpa and just make one more point with respect to something my friend on the other side said which was the point that this evidence somehow is double-edged i just don't think again that that would be a basis for exclusion here this is powerful mitigating evidence that shows that jokar was indoctrinated at the instigation of his brother i think we know that influence and leadership are incredibly powerful mitigating concerns because of what happened in the dc sniper case we know that that was a situation similar to here where lee malvo was a teenager at the time he committed the offense and and he was radicalized at the behest of an older man he believed those crimes were religiously justified all the way through and yet the evidence of influence that he radicalized at someone else's instigation was enough to warrant a life sentence i think that is what could have happened to jokar here if this evidence had been permitted in miss andrews you're welcome to take more time if you'd like uh the court has further questions justice thomas if uh the government had testimony it was almost exactly what you have um but it occurred in let's say roxbury or dorchester and um respondent um was shown to be the leader there and the government attempted to introduce that um as an aggravator what would your response be to the government what would your reaction be to that i think it would be very difficult to keep that evidence out for exactly the same reasons that it would be it would be um and of course the government often argued often offers evidence just like this right evidence just like your honors is positing evidence where we think that the defendant has committed some other offense and there's no way there's no way to know with 100 forensic certainty what actually happened i think even even uh though the uh uh individual who disclosed it is uh has done exactly what uh this individual did to the fbi where uh he's dead now but he uh and he's dead because he attempted to attack them and you would think that would still be admissible i think certainly the defense could make those arguments but yes i think it would be difficult to keep it out for exactly the same reasons that the jury is the primary arbiter of of reliability here and so the jury ought to hear that evidence i think that's what the lower courts have generally held in the case of aggravating evidence of unadjudicated crimes and i'd like that excuse me ask you one question about the jury selection um you said that this uh supervisory room had been in place for quite some time and uh did you suggest at least i got the sense that you thought it was a regularly applied how often has it been applied well as far as we can tell the courts for 50 years have consistently complied uh with this rule so when one or the other party has requested content questioning the district courts have have done it so it has not come up with an appellate issue very much from what we can tell is it published any place other than the one opinion yes the the first circuit has has relied on on the patriarchal rule a couple of times it has said that is the standards of the circuit um standards of the circuit in a case and more recently it has reviewed vardir uh against patriarchy and has concluded that the vardir complied with patriarchy so yes this is something that the first circuit has applied when it has come to it but as i say as far as we can tell generally of course the district courts are um they're complying with this rule and i think that just reflects and this is a routine question that's often asked and helps the government as well we have it we've uh generally given the district judges district courts quite a bit of discretion and uh at the jury selection stage could the court of appeals displace that with a list of mandatory questions that it thinks should be asked in every single uh complicated uh or widely publicized case well i think that would that would present a a closer question um because the district court does have discretion but i think what the district court did here uh was was well within this court's precedents both in the racial bias context uh in rosales lopez and also the moomin decision where the court said that this kind of questioning is helpful and i guess i would just make the point that you know this isn't a wooden rule um this is a rule that the district court has discretion to decide applies at the outset and then it has discretion to decide how to apply it so how do we know how far the court of how do you know whether a rule is too detailed or there are too many rules or too wooden well i suspect it would it would turn on something of a of a functional analysis i think the reason for district court discretion is that generally we think of the district court as a more better place you know to to decide what questions to ask in the moment but the court said in rosales lopez is that there's nothing inconsistent about that recognition and having some narrow rules where um eliciting more information is both a good idea and also serves judicial integrity so i do think there would probably be some point at which we would think that that no longer is the serving the purpose it was supposed to serve but i think we're very far from that here because you know this again is a very narrow rule that follows directly from moomin and is within the framework that the court announced in rosales lopez thank you justice breyer justice before the justice barrett thank you counsel rebuttal mr fagan thank you mr chief justice the court's been quite generous with its time and i just want to make three points one um and they're all focused on waltham because i think that's really the only thing that uh respondents focused on at this point uh one is that uh my friend on the other side analogized this todoshev statement to a statement against interest i don't think it would come in under that rule because his own admission to involvement in the crime would be but his attempt to pin it all on the dead man tamerlan uh the boston bombing suspect would not be uh second they've in as far as admissibility they've really focused on this indoctrination theory and i think that is really not especially probative of uh anything that is mitigating here i mean essentially what they'd be arguing to the jury is yeah tamerlan sent all this jihadist literature and but what really got me into jihadist literature was learning that uh what the end of the road in jihad is committing murder and moreover i want to amp that up by committing murder at the finish line of the boston marathon i don't think that is particularly helpful or particularly probative for as far as mitigation goes and i think that dovetails with the third point i want to make here which is it's in some ways easy to view all this from an appellate remove which is what we're doing here but the easiest way to resolve this case is simply on actually heard i don't think this comes through as much in the briefs as if the court takes a little bit of time it'll only take a little bit of time to review some of the video evidence that's included in the joint appendix i particularly recommend exhibits 22 23 and 1304 c and what those exhibits show i've already gone through some of the evidence about respondent being involved in the planning of the offense but what those exhibits are going to show is respondent physically separating from his brother near the finish line of the boston marathon positioning himself behind a group of children putting down his backpack we can't really quite see that part but rest assured that he did it putting down his backpack contemplating for about three minutes taking out his phone and calling his brother after which the first bomb goes off so tamerlan's clearly waiting for a signal from respondent respondent then while everyone in the forum restaurant patio is panicking and wondering what just happened actually they don't even know enough to panic yet respondent walks off at a normal rate of speed it's not a very wide angle camera on the screen before 20 seconds later the second bomb explodes killing and maiming people that were minutes ago one seconds ago i'm sorry wondering what had just happened if that's not someone who set off the bomb himself or at least knew exactly when it was going to go off and what its blast radius was going to be i don't know what is then after the bombing respondent who lives 60 miles away from tamerlan joins up with tamerlan for a daring escape in which they kill in a police officer in cold blood in a failed attempt to steal his firearm they carjack and kidnap an innocent graduate student and then they engage in a violent shootout with police officers in watertown during which respondent is lighting pipe bombs and throwing them at the police then when tamerlan rushes the police respondent gets back in the stolen suv and instead of just driving away he does a three-point turn he comes back at the confrontation the police officers get managed to get out of the way but he runs over tamerlan he then destroys his phone so that he can't be located and hides out in the someone's backyard in a boat where he writes a manifesto justifying his jihadist acts that's all the evidence that the jury heard that was admissible evidence that came in in this case and the jury's nuanced verdict in this case was based on that evidence not anything about you